**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| MICHAEL BASSETT,<br>on Behalf of Himself and All<br>Others Similarly-Situated,<br><br>*Plaintiff,*<br><br>v.<br><br>UNIVERSAL PROTECTION SERVICE,<br>LLC,<br><br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **PROPOSED COLLECTIVE ACTION**<br>**UNDER FLSA AND CLASS ACTION**<br>**UNDER KWHA**<br><br>CASE NO.   4:21-CV-112-JHM<br><br><br>**JURY DEMANDED** |

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Comes Plaintiff Michael Bassett, on behalf of himself and all others similarly-situated, by and through counsel, and, for his Class and Collective Action Complaint against Defendant Universal Protection Service, LLC, states as follows:

## I.    Summary of the Action

1.    This action seeks to recover unpaid wages owed by Defendant to Plaintiff and similarly situated employees.  Defendant, which is a large employer employing over 300,000 employees nationwide, deprives its employees of wages in ways so fundamental that it can only be assumed, given the size and sophistication of Defendant, that Defendant's violations are part of an intentional process to steal the hard-earned wages of its workers.

2.    Specifically, Defendant violated the Fair Labor Standards Act ("FLSA") and the Kentucky Wages and Hours Act ("KWHA") in at least five ways.

3.      First, Defendant did not pay employees for time worked before scheduled shifts, despite knowing (and in fact setting up systems to document) that employees were, pursuant to Defendant's direction and by necessity and the nature of Defendant's work, arriving at the work location and beginning to perform work prior to the scheduled beginning of the shift.

4.      Second, Defendant amazingly (especially for an employer of more than 300,000 employees) paid overtime rates of pay that were, on the face of the paystub, significantly less than 1.5 times the base hourly rate of pay shown on the same paystub.

5.      Third, Defendant failed to properly calculate the overtime rate of pay because Defendant did not include in that calculation anniversary bonuses, which were compensation for work performed.

6.      Fourth, Defendant promised to pay employees a higher rate of pay for working on designated holidays, but did not do so, instead showing "holiday" pay on the paystub at the ordinary rate, and not adding any other amount for the employee working the holiday.

7.      Finally, Defendant would, despite agreeing to pay employees a certain rate of pay, and even reflecting that pay rate on the upper portion of the paystub as the employee's rate of pay, sometimes arbitrarily and without advance notice to (or agreement with) the employee simply pay the employee for work already performed at a lower rate of pay.

## II.      Jurisdiction and Venue

8.      This Court has jurisdiction over the claims of Plaintiff and those similarly situated pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

9.      This Court has and should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under the KWHA because they are so related to Plaintiff's claims

under the FLSA that they form part of the same case or controversy and arise from the same set of operative facts as Plaintiff's claims under the FLSA.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant conducted business within the District, employed Plaintiff (who resides in Hopkins County, Kentucky, within the District of this Court) and other similarly-situated employees within the District of this Court and specifically, in the course of doing business in this District, Defendant was compensated by customers in exchange for Defendant's providing of security services through the work of Plaintiff and other similarly-situated security guard employees.

### III.     Parties

11.      Plaintiff Michael Bassett is a resident of Hopkins County, Kentucky.

12.     Plaintiff has consent to this action pursuant to 29 U.S.C. § 216(b), and a copy of his consent is attached hereto as Exhibit 1.

13.     Defendant Universal Protection Service, LLC is a for-profit limited liability company organized under Delaware law, which has listed with the Kentucky Secretary of State its principal place of business as 1551 N. Tustin Ave., #650, Santa Ana, CA 92705, and may be served by service of process on its registered agent, CT Corporation System, at 306 West Main Street, Suite 512, Frankfort, KY.

14.     Defendant is and has at all times within the last three years been subject to the FLSA with respect to all of Defendant's security guard employees employed in the Commonwealth of Kentucky.

15.     Throughout Plaintiff's employment, and, indeed, at all times within the last three years, Defendant had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A). 13.

16.     Throughout Plaintiff's employment, and, indeed, at all times within the last three years, Defendant had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person." as defined in 29 U.S.C. § 203(s)(1)(A).

17.     Indeed, Defendant has more than 300,000 employees.

18.     A copy of the "Careers" page of Defendant's website is attached hereto as Exhibit 2.

19.     The "Careers" page of Defendant's website asserts that Defendant has more than 300,000 employees.

20.     Throughout Plaintiff's employment, and, indeed, at all times within the last three years, Defendant had an annual gross volume of sales made or business done of not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(1)(A).

21.     Throughout Plaintiff's employment, and, indeed, at all times within the last three years, Defendant was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the 29 U.S.C. § 203(s)(1).

22.     Defendant furnishes, pursuant to contracts with its customers (who are generally other companies), security guards to guard the premises of Defendant's customers.

23.     Plaintiff is and has been an employee of Defendant.

24.     Defendant employs Plaintiff as a security guard, and assigns other similarly-situated security guard employees to work for Defendant on the premises of Defendant's customers as security guards.

25.     Plaintiff's work as a security guard is not, and has throughout the last three years not been, exempt under the FLSA and KWHA.

26.     The work of the other security guard employees employed in the Commonwealth of Kentucky is not, and has throughout the last three years not been, exempt under the FLSA and KWHA.

27.     Defendant itself classifies, and has throughout the last three years classified, Plaintiff as not exempt under the FLSA and KWHA.

28.     Defendant itself classifies, and has throughout the last three years classified, its other security guard employees employed in the Commonwealth of Kentucky as not exempt under the FLSA and KWHA.

29.     Defendant earns substantial profits by charging Defendant's customers substantially more for furnishing security guards than it pays the security guards in wages.

30.     However, unsatisfied with the substantial profits Defendant's business model would produce even if Defendant paid Plaintiff and similarly-situated employees legally and as promised, Defendant systematically violated the Fair Labor Standards Act and the Kentucky Wages and Hours Act by failing to pay its employees the wages it promised and was required by law to pay.

## IV.     Factual Allegations

**A.     Defendant Fails To Pay Employees For Work Performed Prior To the Scheduled Beginning Of Their Shifts.**

31.     Ahlstrom-Munskjo Filtration, LLC (hereafter, "Ahlstrom") is one of Defendant's customers, and has a manufacturing facility in Madisonville, Kentucky.

32.     Ahlstrom paid Defendant to provide sufficient security guard employees of Defendant so as to provide Ahlstrom with twenty-four-hour-per-day security guard coverage.

33.     To provide this coverage, Defendant scheduled Plaintiff and other employees to work shifts that were purportedly (as opposed to in actuality, as discussed more below) to start and stop at the exact same time (and thus to purportedly not overlap).

34.     For example, one employee may be purportedly scheduled to work from midnight to 8:00 a.m., another from 8:00 a.m. until 4:00 p.m., and a third from 4:00 p.m. until midnight.

35.     Defendant scheduled employees to work purportedly-nonoverlapping shifts despite knowing that, by necessity and the nature of the work, the employees would have to spend time overlapping to ensure that the post was not vacant and to communicate to the employee taking over the post what had occurred during the prior shift and what events were expected to occur in the upcoming shift.

36.     Indeed, Defendant specifically contemplated that such work would be required and instructed Plaintiff and the similarly situated employees to report prior to the scheduled beginning of their shift in order to engage in this work.

37.     A copy of Defendant's Employee Manual is attached hereto as Exhibit 3.

38.     Defendant's Employee Manual specifically contemplated that such work would be performed; specifically, it stated as follows (at page 35 of Exhibit 3):

> To leave your post properly at the end of your scheduled shift, you must be "relieved." Proper "relief" can be either (1) replacement by another officer who assumes your post, or (2) the end of your shift when no other officer is assigned to secure your post.
>
> Prior to the end of your shift, make sure that the post area is clean and your Pass-down log, Daily Activity Report or other similar written or electronic document maintained during your shift is ready for the relief officers. Any interactions with on-coming Security Professionals should be brief. **If such "pass-down" time requires that you perform work beyond the end of your scheduled shift, then you must document such time on your timesheet to reflect the actual time worked that day.**

Emphasis added.

2.      **From 2020 On, Defendant Has Utilized a Timekeeping System Which Defendant Knows Records the Pre-Shift Work.**

39.      Further, in the year 2020, Defendant began requiring Plaintiff and other security guard employees to call into a system it called "Team Time", an automated timeclock phone system, when they arrived at the post.

40.      As they had prior to the implementation of the "Team Time" system, and as Defendant had instructed them to do, after the implementation of the "Team Time" system, Plaintiff and the similarly-situated employees continued to arrive at the work post prior to the scheduled beginning of the shift to ensure that the worker being relieved could leave on time without the work post being vacant and to communicate with the employee whose shift was ending regarding the work.

41.      With the implementation of "Team Time," in addition to the pre-shift activities of reporting early as directed by Defendant and communicating with the employee whose shift was ending, employees were also now tasked with calling into the "Team Time" system upon arriving at the post.

42.      Upon an employee calling the "Team Time" phone system, the Team Time phone system then automatically stated to the employee the then-current time.

43.      For example, if an employee arrived fourteen minutes in advance of an 8:00 a.m. scheduled shift and called in to Team Time at that time, the Team Time system would state "the time is forty-six minutes after the hour" (or words substantially to that effect).

44.      After the Team Time system stated the then-current time, Plaintiff and the similarly-situated employees would enter (using the phone keypad) into the Team Time system the employee's employee number.

45.     Upon information and belief, the Team Time system recorded and preserved in Defendant's records the actual and exact time (at least to the minute) the employee called in to Team Time each time the employee called in to Team Time.

46.     However, despite requiring employees to call into "Team Time" upon arriving at the post and reporting for work, Defendant did not pay the employees in accordance with the time that was recorded by the employees through the "Team Time" system as having been worked by the employees.

47.     Instead, Defendant continued to pay employees under the fiction that each of its employees worked only during the scheduled, nonoverlapping shifts (which Defendant knew was false, and which Defendant's Team Time information demonstrated to Defendant was false by contemporaneously and accurately recording the earlier-than-the-scheduled-start-of-shift time employees would call in, reporting that they were at the work station and performing work).

**3.     Defendant Designed the Team Time Phone System to Prevent Employees from Easily Accessing the Information Relating to the Time Employees Arrived and Began Performing Work.**

48.     Defendant required employees to call into the Team Time system from a landline located in the "guard shack" (or other place where security guards gathered) at the customer's facility if such a landline was available.

49.     If such a landline was available, Defendant set up the Team Time system so that employees could not call into the Team Time number from their personal cellular telephones, and instead had to call into the Team Time number from the landline.

50.     This was done despite the fact that the Team Time system could and did receive calls from employees' cellular telephones.

51.     For instance, Plaintiff worked on the weekend for Bakery Feeds, a customer of Defendant in Henderson, Kentucky.

52.     When Plaintiff would report to work at Bakery Feeds, Plaintiff would call into the Team Time system using his cellular telephone because there was not a landline available for security guard employees for Defendant at the Bakery Feeds location.[1]

53.     Upon information and belief, one of the principal reasons Defendant set up the Team Time call-in system to require employees to call from a landline whenever one was available was to preventing employees from being able to easily access (from their personal cell phones) the information relating to what time they called in to the Team Time system.

54.     For instance, Defendant could have installed timeclocks at the work location to require an employee to be physically in order to clock-in, but chose not to do so.

55.     Defendant did not use timeclocks (other than "Team Time") at any location Plaintiff worked and, upon information and belief, Defendant did not have security guard employees use timeclocks (other than "Team Time") anywhere in Kentucky.

56.     In effect, the "Team Time" system was a timeclock, recording employee start times.

57.     However, Defendant willfully ignored the times employees recorded using that system because it did not want to pay for work prior to the scheduled start of the shift.

---

[1]     To be clear, Bakery Feeds did not have twenty-four-hour security guard coverage.  Instead, during the weekends, which was when Plaintiff would work at Bakery Feeds, Bakery Feeds contracted only for twelve hours of coverage.  Plaintiff would provide all of this coverage and therefore neither relieved another employee at the beginning of his shift nor was relieved by another employee at the end of his shift.  Therefore, Plaintiff would call into Team Time promptly upon arriving at Bakery Feeds and would call into Team Time again as close to twelve hours later as possible, and would then leave.  Therefore, Plaintiff did not perform "off-the-clock" work at the Bakery Feeds location like he did at the Ahlstrom location.  However, Plaintiff's work at the Bakery Feeds location, including his access of the Team Time system at that location from his personal cell phone there, does illustrate that Defendant's Team Time system had the capability of permitting employees to call into the Team Time system using their personal cell phones, but Defendant chose to prohibit Plaintiff and similarly situated employees from doing so whenever possible in order to prevent Plaintiff and the similarly situated employees from being able to use their cellular telephones to demonstrate the time that they called in to the Team Time system.

      **4.**      **Rather Than Using the Time the Employee Actually Began Working (or the Time Recorded By the Team Time System as the Time the Employee Had Reported and Was Working), Defendant Demands that Employees Falsely Document That They Did Not Begin Work Until the Shift Start Time.**

58.     Despite Defendant's "Team Time" system contemporaneously stating to the employee the then-current time, Defendant directed Plaintiff and the similarly-situated employees to not record that time, but to instead record on a handwritten record of hours the employee's scheduled shift start time as the "On Post" time.

59.     This was a continuation of a system Defendant used prior to the implementation of the "Team Time" system; throughout Plaintiff's employment with Defendant, Defendant required Plaintiff and similarly-situated to record only their scheduled shift (and to not record pre-shift work Defendant knew the employees were performing) on the handwritten time sheet.

60.     For example (and continuing the example provided in Paragraph 43 above), an employee who, in advance of an 8:00 a.m. shift change, started work at 7:46 a.m. (i.e., in that minute arrived at the work location, began work, and called in to Team Time system) was to (according to the directions Defendant provided to Plaintiff and similarly-situated security guard employees) record on the handwritten record of hours that the employee was "On Post" at 8:00 a.m.

61.     Attached hereto as Exhibit 4 is an example of Defendant's form of handwritten time sheet.

62.     Defendant knew that the handwritten time sheet documents (the documents it had employees complete in the same form as Exhibit 4) were not accurate records of the amount of time each employee worked, and that, instead, each employee worked more time than was shown on the handwritten time sheet.

63.     Despite knowing that employees worked more time than was shown on the handwritten timesheet, Defendant included language on its form of handwritten time sheet that "[e]ach individual signing this sheet thereby affirms that the information written on the sheet is true and correct".

64.     Defendant instructed employees to provide false information about their time worked (and, specifically, instructed employees to always enter their scheduled shift start time as the "On Post" time on the handwritten time sheet, despite employees regularly starting work earlier than the scheduled shift start time), and to do so in spite of the language shown on the face of the handwritten time sheet regarding "the information written on the sheet [being] true and correct".

65.     Defendant expected and hoped that employees would, as instructed, provide false information on the handwritten time sheet about their time worked (and, specifically, expected and hoped employees would always enter their scheduled shift start time as the "On Post" time on the handwritten time sheet, despite employees regularly starting work earlier than the scheduled shift start time).

66.     Plaintiff and the other employees, as directed, expected and hoped by Defendant, recorded on the vast majority of the handwritten timesheets, including Exhibit 4, that the employee was only "On Post" beginning at the shift start time.

67.     However, Plaintiff appeared at the workstation and began performing work prior to the time shown as "On Post" on each of the days for which he has entries on Exhibit 4.

68.     In addition, upon information and belief, each of the other employees shown on Exhibit 4 likewise appeared at the workstation and began performing work prior to the time shown as "On Post" on each of the days for which he has entries on Exhibit 4.

69.     Each employee shown on Exhibit 4 called in to Defendant's Team Time system from the landline located at the Ahlstrom "guard shack" for each day shown on Exhibit 4.

70.     For instance, upon information and belief, Defendant's "Team Time" system recorded that Plaintiff called in to Team Time on September 27, 2021 earlier than 4:00 p.m. on September 27, 2021.

71.     Further, upon information and belief, Defendant's "Team Time" system recorded that Haydiannette Baez called to Team Time on September 25, 2021 prior to 8:00 a.m.

**5.     Defendant Did Not Pay Employees for the Pre-Shift Work, Despite Knowing That It Occurred.**

72.     Defendant did not pay for employees' work prior to the scheduled beginning of the shift despite (A) Defendant requiring employees to arrive at the workstation prior to the scheduled beginning of the shift and knowing that employees did so, (B) Defendant requiring employees to call into "Team Time" upon arriving at and reporting for work, and knowing employees regularly did so prior to the scheduled beginning of their shifts, and (C) Defendant requiring employees to communicate prior to the scheduled beginning of the shift with the employee(s) whose shift was ending regarding events that had and were expected to occur in connection with the employees' security guard work, and knowing employees did so.

73.     Instead, Defendant only paid employees under the fiction that each of its employees worked only the scheduled nonoverlapping shifts (which fiction Defendant knew was false, and which Defendant's Team Time information demonstrated to Defendant was false by contemporaneously and accurately recording the earlier-than-the-scheduled-state time employees would call in, reporting that they were at the work station and performing work).

      **6.**     **Defendant Did Not Pay for Pre-Shift "On Shift" Time, Even If Such Time Was Reported on the Handwritten Timesheet in Violation of Defendant's Instructions to Not Report Such Time on the Handwritten Timesheet.**

74.     Further, if an employee ever provided an accurate "On Post" time prior to the scheduled beginning of that employee's shift on the handwritten timesheet, Defendant would nevertheless not pay the employee for the additional time the employee listed as the time the employee had been "On Post" prior to the scheduled beginning of the shift.

75.     For example, attached hereto as Exhibit 5 is Defendant's handwritten timesheet for the Ahlstrom facility for the period from October 1, 2021 until October 7, 2021.

76.     On this timesheet, Plaintiff reported on Exhibit 5 that he was "On Post" at 3:45 pm on October 4, 2021 (in advance of his scheduled shift start time of 4:00 pm).

77.     Further, Plaintiff reported on Exhibit 5 under the "total hours" column of the timesheet that he worked "8 ¼ hours" on October 4, 2021.

78.     Defendant's "facility supervisor" for the Ahlstrom facility, Haydiannette Baez, reported on Exhibit 5 that she was present from 8:00 am until 4:00 pm on October 4, 2021, including present during the period from 3:45 pm until 4:00 pm that Plaintiff reported that he was present and "On Post" prior to the scheduled beginning of his shift at 4:00 pm.

79.     Further, Ms. Baez included Plaintiff's additional fifteen minutes of reported-on-the-handwritten-timesheet time with the hours for the other employees in approving on Exhibit 5 "168 ¼" hours of work at the Ahlstrom facility during the period from October 1, 2021 until October 7, 2021.

80.     The handwritten timesheet attached hereto as Exhibit 5 was transmitted by Ms. Baez to Defendant's management.

81.     No employee of Defendant ever spoke with Plaintiff to determine any facts or other information regarding the compensability of Plaintiff's time from 3:45 pm until 4:00 pm on October 4, 2021 before Defendant issued its paycheck for the period from October 1, 2021 until October 7, 2021.

82.     Upon information and belief, the reason that no employee of Defendant spoke to Plaintiff to determine any facts or other information regarding the compensability of Plaintiff's time from 3:45 pm until 4:00 pm on October 4, 2021 was that Defendant was already aware that Plaintiff and the other employees were "On Post" and performing work prior to the time reported on Defendant's form of timesheet (both for Exhibit 5 specifically and for the form of handwritten timesheet, generally), and that this time was compensable, but Defendant had decided that it was not going to compensate the employees for their work prior to the scheduled beginning of the shift.

83.     Defendant paid Plaintiff for exactly eight hours for his work at the Ahlstrom facility for the period October 1, 2021 until October 7, 2021.

84.     Defendant did not pay Plaintiff any amount for the period from 3:45 p.m. until 4:00 p.m. on October 4, 2021.

85.     Specifically, attached hereto as Exhibit 6 is Defendant's paystub to Plaintiff for his work during the period from October 1, 2021 until October 7, 2021, which paid Plaintiff for "32.00" hours.

86.     The thirty-two hours paid to Plaintiff for his work during the period from October 1, 2021 until October 7, 2021 consisted of (A) eight hours of work at the Ahlstrom facility from 4:00 p.m. until 12:00 midnight on October 4, 2021, (B) twelve hours of work at the Bakery Feeds Facility on October 2, 2021 and (C) twelve hours of work at the Bakery Feeds Facility on October 3, 2021.

87.     Defendant's refusal to pay Plaintiff for the period of time it knew that Plaintiff had worked from 3:45 p.m. until 4:00 p.m. on October 4, 2021 was not a mistake or aberration.

88.     Instead, this nonpayment was pursuant to and consistent with Defendant's overall policy of only paying employees for their scheduled shift of work.

89.     For another example, attached hereto as Exhibit 7 is a handwritten timesheet for Defendant's employees working at the Ahlstrom location from October 8, 2021 until October 14, 2021.

90.     During this period, Plaintiff recorded that during his shift on October 11, 2021, he arrived "On Post" at 15:50 (3:50 pm) in advance of his scheduled shift start time of 4:00 pm.

91.     Plaintiff called in to the "Team Time" system from the landline at Ahlstrom's "guard shack" at 3:50 p.m. on October 11, 2021, and the "Team Time" system informed Plaintiff at that time that the then-current time was 3:50 p.m.

92.     Defendant's "Team Time" system recorded and preserved that Plaintiff called in to the "Team Time" system at 3:50 p.m. on October 11, 2021

93.     Plaintiff further recorded on Exhibit 7 that his total number of hours for October 11, 2021 was "8 1/6" hours.

94.     Defendant's "facility supervisor" for the Ahlstrom facility, Haydiannette Baez, reported on Exhibit 7 that she herself was present during the time from 8:00 am until 4:00 pm on October 11, 2021, including the time from 3:50 pm until 4:00 pm that Plaintiff reported on the timesheet that he was present and "on post" prior to the scheduled beginning of his shift at 4:00 pm.

95.     Further, Ms. Baez signed Exhibit 7 as being true and accurate, including the additional one-sixth of an hour included by Plaintiff.

96.     Ms. Baez transmitted Exhibit 7 to Defendant's level of management higher than Ms. Baez, reporting that Plaintiff worked more than eight hours on October 11, 2021 by working ten minutes prior to the scheduled beginning of his shift in addition to the full eight hour shift.

97.     No employee of Defendant ever spoke with Plaintiff to determine any facts or other information regarding the compensability of Plaintiff's time from 3:50 pm until 4:00 pm on October 4, 2021 before Defendant issued its paycheck for the period from October 1, 2021 until October 7, 2021.

98.     Upon information and belief, the reason that no employee of Defendant spoke to Plaintiff to determine any facts or other information regarding the compensability of Plaintiff's time from 3:45 pm until 4:00 pm on October 4, 2021 was that Defendant was already aware that Plaintiff and the other employees were "On Post" and performing work prior to the time reported on Defendant's form of timesheet (both for Exhibit 5 specifically and for the form of handwritten timesheet, generally), and that this time was compensable, but Defendant had decided that it was not going to compensate the employees for their work prior to the scheduled beginning of the shift.

99.     Defendant, following its general policy that it would only pay employees from the scheduled beginning of their shift until the scheduled end of their shift, paid Plaintiff only eight hours for his work on October 11, 2021.

100.    Defendant only paid Plaintiff for exactly eight hours of work at the Ahlstrom facility during the period from October 8, 2021 until October 14, 2021.

101.    Defendant did not pay Plaintiff any amount for the period from 3:50 p.m. until 4:00 p.m. on October 11, 2021.

102.    Specifically, attached hereto as Exhibit 8 is Defendant's paystub to Plaintiff for his work during the period from October 8, 2021 until October 14, 2021.

103.   During this period, Defendant paid Plaintiff exactly thirty-two hours for his work, which consisted of payment for (A) eight hours of work at the Ahlstrom facility on October 11, 2021 from 4:00 p.m. until 12:00 midnight, (B) twelve hours of work on October 9, 2021 at the Bakery Feeds Facility and (C) twelve hours of work for Plaintiff's work on October 10, 2021 at the Bakery Feeds Facility.

### 7.   Defendant's Policy of Not Compensating Pre-Shift Work Had the Effect of Depriving Plaintiff and Similarly-Situated Employees of Overtime Compensation.

104.   The time that Defendant should have paid, but did not pay (from the time employees reported to work and began to perform work for Defendant until the time Defendant began paying Plaintiff and the similarly situated employees for working) was in many cases overtime work.

105.   Stated another way, Plaintiff and similarly-situated security guard employees of Defendant worked more than forty hours in many workweeks during which the employee was not compensated for part of the work performed because of Defendant's illegal policy of not paying for worked performed "off-the-clock" prior to the scheduled beginning of the shift.

### B.   Defendant Pays Brazenly Overtime Rates Of Pay Less Than 1.5 Times The Base Hourly Rate Of Pay

106.   Even for the time that Defendant did pay Plaintiff and the similarly situated employees, Defendant often failed to pay the correct hourly rate of overtime compensation for employees' overtime work.

107.   Specifically, in addition to not taking into account all compensation for worked performed as described in more detail in Section IV(C) below, Defendant often brazenly reflected on Plaintiff's paystub that Plaintiff was being paid an hourly rate of overtime compensation that was significantly less than 1.5 times Plaintiff's base hourly rate of pay shown on the paystubs.

108.    Plaintiff's paystubs reflecting amounts Defendant paid Plaintiff for work Plaintiff performed from March 21, 2019 until August 5, 2021 are attached hereto collectively as Exhibit 9.

109.    Exhibit 9 are not all of the paystubs Defendant ever provided to Plaintiff; Plaintiff was employed by Defendant before and after the period covered by Exhibit 9; Exhibit 9 is provided simply as a sample period of paystubs provided by Defendant to Plaintiff.

110.    Plaintiff's paystub reflecting amounts Defendant paid Plaintiff for work Plaintiff performed during the period of July 23, 2021 through July 29, 2021 is attached hereto as Exhibit 10.

111.    Upon information and belief, Exhibit 10 is one example of many examples of paystubs provided by Defendant to its security guard employees (including one of many examples of paystubs Defendant provided to Plaintiff) that reflect that Defendant paid the employee an hourly rate significantly less than 1.5 times the base rate of pay reflected on the same paystub.

112.    Specifically, Exhibit 10 shows that during the period from July 23, 2021 through July 29, 2021, Defendant credited Plaintiff with having worked forty hours of non-overtime work and sixteen hours of overtime compensation.

113.    Exhibit 10 shows that Plaintiff was paid at an hourly rate of $12.50 for all of his forty hours of non-overtime work during the period from July 23, 2021 through July 29, 2021.

114.    Accordingly, Plaintiff was paid $500.00 for his 40 hours of non-overtime work during the period from July 23, 2021 through July 29, 2021.

115.    However, Exhibit 10 also shows that Defendant paid for the sixteen hours of overtime work Defendant credited Plaintiff with having performed during the period from July 23, 2021 through July 29, 2021 at an overtime compensation rate of only $15.895 dollars per hour.

116.     Therefore, Exhibit 10 shows that Plaintiff was paid total amount of wages of $754.32 for Plaintiff's work during the period from July 23, 2021 through July 29, 2021.

117.     Exhibit 10 accurately reflects the amount Plaintiff was paid for his work during the period from July 23, 2021 through July 29, 2021; in other words, Plaintiff was in fact paid in accordance with the facts stated about Exhibit 10 in the five preceding paragraphs and Plaintiff was not paid any additional amounts not shown on Exhibit 10 for Plaintiff's work during the period from July 23, 2021 through July 29, 2021.

118.     1.5 times $12.50 per hour is $18.75 per hour.

119.     Accordingly, if Plaintiff were paid $18.75 per hour for the sixteen hours of overtime work Defendant credited Plaintiff with having performed during the period from July 23, 2021 through July 29, 2021 (he was not), Plaintiff would have been paid $300.00 (16 times $18.75) for those sixteen hours.

120.     Defendant provided no explanation whatsoever for depriving Plaintiff of the difference in pay between the rate of overtime compensation shown on Exhibit 10 and the actual overtime rate of compensation owed.

121.     Defendant often scheduled Plaintiff to work fifty-six hours per week and often paid Plaintiff for working fifty-six hours per week.

122.     Defendant knew how to, and sometimes did, pay Plaintiff an overtime rate of pay that was exactly 1.5 times Plaintiff's base hourly rate of pay for the sixteen overtime hours included on a fifty-six hour paystub.

123.     For example, Exhibit 11 is Plaintiff's paystub from Defendant for pay paid on July 22, 2021 for the pay period worked July 9, 2021 until July 15, 2021 ("July 22, 2021 Paystub").

124.    Like the August 5, 2021 paystub attached as Exhibit 10 (for the period from July 23, 2021 through July 29, 2021), Exhibit 11 reflects that Defendant credited Plaintiff with having worked exactly fifty-six hours during the period from July 9, 2021 through July 15, 2021.

125.    Exhibit 11 reflects that Defendant paid Plaintiff $18.75 per hour for the sixteen hours of overtime work Defendant credited Plaintiff with having worked from July 9, 2021 until July 15, 2021 and $12.50 per hour for the first forty hours Defendant credited Plaintiff with having worked during that period, totaling $800.00.

126.    Exhibit 11 accurately reflects the amount Plaintiff was paid for his work during the period July 9, 2021 until July 15, 2021; in other words, Plaintiff was in fact paid in accordance with the facts stated about Exhibit 11 in the three paragraphs immediately preceding this paragraph.

127.    The August 5, 2021 paystub (Exhibit 10) was not a solitary incident of Defendant paying an overtime rate of pay less than 1.5 times the base hourly rate of pay; to the contrary, Defendant paid Plaintiff an overtime rate of pay of less than 1.5 times the base hourly rate of pay reflected on the same paystub on many occasions.

128.    As other examples (but this list also does not include a complete listing of all of Defendant's violations by payment of an overtime rate lower than 1.5 times the stated base rate of pay), Exhibit 12 attached hereto is Plaintiff's paystub for pay received from Defendant on August 6, 2020 for the pay period from July 24, 2020 until July 30, 2020 ("the August 6, 2020 Paystub"), Exhibit 13 attached hereto is Plaintiff's paystub for pay paid by Defendant on December 26, 2019 for the period from December 13, 2019 until December 19, 2019 ("the December 26, 2019 Paystub"), and Exhibit 14 attached hereto is Plaintiff's paystub for pay paid on July 15, 2021 for the period worked from July 2, 2021 until July 8, 2021 ("the July 15, 2021 Paystub").

129.    Despite each of the July 15, 2021 Paystub, the August 6, 2020 Paystub, and the December 26, 2019 Paystub showing that Plaintiff was paid for non-overtime work at a base hourly rate of $12.50 per hour, Defendant paid overtime compensation on each of these paystubs at overtime rates of pay of less than 1.5 times that stated base rate of pay.

130.    Specifically, on the August 6, 2020 Paystub (Exhibit 12), Defendant paid Plaintiff for eight hours of overtime work at a rate of $15.625 per hour (1.25 times Plaintiff's $12.50 per hour base rate of pay).

131.    On the December 26, 2019 Paystub (Exhibit 13), Defendant paid two separate overtime rates, both of which were less than 1.5 times the stated base rate of pay: Defendant paid Plaintiff for ten hours of overtime work at a rate of $18.37 per hour (1.47 times Plaintiff's $12.50 per hour base rate of pay) and paid Plaintiff for sixteen hours of overtime work at a rate of $15.22 per hour (1.22 times Plaintiff's $12.50 per hour base rate of pay).

132.    On the July 15, 2021 Paystub (Exhibit 14), Defendant paid Plaintiff for all of the overtime hours shown on that paystub at a rate of $18.305 dollars per hour (1.4644 times Plaintiff's $12.50 per hour base rate of pay).

133.    Defendant never provided any explanation for paying Plaintiff's overtime compensation at a rate of less than 1.5 times Plaintiff's stated base hourly rate of pay.

134.    Upon information and belief, Defendant has regularly paid other security guard employees employed in Kentucky overtime compensation of less than 1.5 times the non-overtime rate of pay stated on the employee's paycheck.

135.    Upon information and belief (including based on Defendant's size as an employer employing over 300,000 employees, its failure to provide any explanation for paying an overtime rate of pay that was less than 1.5 times the base rate of pay, and the repeated nature of Defendant's

violations), Defendant's payments of less than 1.5 times the base rate of pay were intentional violations by Defendant of Defendant's obligation to pay overtime compensation to Plaintiff and similarly-situated employees.

### C.     Defendant Fails to Include All Compensation for Work Performed in Calculating the Overtime Rate of Pay

136.    Defendant failed to properly calculate the overtime rate of pay because Defendant did not include in that calculation additional compensation Defendant paid to employees for work performed.

137.    Defendant's Employee Handbook provides, at pages 58-59, a detailed and promised-in-advanced "anniversary bonus program".

138.    Under this program, employees are entitled to expect and anticipate that, as part of their compensation for work performed over the course of one year, employees will be paid, depending on the facility at which the employee worked, either an amount equivalent to one or more week's pay or an anniversary bonus of a certain stated amount of money (depending on the employee's current average weekly hours; for example, employees working a current average weekly hours of forty or more at certain facilities would receive $200.00).

139.    On Plaintiff's anniversary of employment in 2020, Defendant paid Plaintiff $500.00 in addition to paying Plaintiff for the hours Defendant credited Plaintiff with actually working.

140.    $500.00 was the same amount as Plaintiff would earn for working forty non-overtime hours at his base rate of pay of $12.50 per hour.

141.    In years prior to 2020, Defendant paid Plaintiff a lump sum on Plaintiff's anniversary of employment equal to his base rate of pay times forty.

142.    When Defendant made payment to Plaintiff and the similarly-situated employees of a lump sum equal to forty times the employee's hourly rate of pay, that payment was the only way in which the employee was eligible to receive the anniversary bonus.

143.    Although Defendant listed the payment (to Plaintiff and similarly-situated employees of the lump sum equal to forty times the employee's hourly rate of pay upon reaching their anniversary) on the employee's paystub under a line entitled "Vacation Cas" (see page 80 of Exhibit 9 (paystub with Advice Date 5/7/2020)), the anniversary bonus never took the form of an actual paid vacation, and employees were not permitted to take paid time off as a result of the employee having worked through an anniversary of employment.

144.    Instead, even if referenced by Defendant as relating somehow to a vacation, the anniversary bonus never took the form of paid vacation days which employees could use, either at the time of the anniversary of employment or at any other time during the year.

145.    If employees desired to take time off, Defendant never paid for that time off as a result of the employee having worked through an anniversary of employment; paid time off would instead be available only under the very limited circumstances (unrelated to whether the employee worked through an anniversary of employment) explained in Pages 66 through 68 of Defendant's Employee Handbook (Exhibit 3).

146.    In short, Defendant did not provide paid time off at all, except in connection with jury duty if applicable law required Defendant to pay for such time (Defendant also describes in the "Time Off Benefits" section of the Employee Handbook that attending legal proceedings relating to Defendant's work pursuant to a subpoena may be paid, such time is not "time off" but instead is work).

147.     Upon information and belief, although the Employee Handbook indicates that Defendant might "provide paid vacations" if "specifically required under a collective bargaining agreement or a Customer contract," Defendant did not in fact offer actual paid vacations (as opposed to lump sum payments characterized as "vacation cashouts") to any security guard employee employed in Kentucky.

148.     Upon information and belief, Defendant's employees did not take substantially more time off on weeks during which the anniversary bonus was paid than during other weeks.

149.     Further, Defendant never asked employees whether they wanted a paid vacation or payment of the anniversary bonus in the form of a lump sum of money.

150.     In effect, then, the anniversary bonus, whether treated as payment of one or more weeks of "vacation equivalent" (the way in which this compensation was referred on Page 59 of Exhibit 3, which is part of the "Anniversary Bonus Program" section of Defendant's employee handbook) or the payment of $200.00, was always the payment of a certain amount of money.

151.     Defendant indicated in the Employee Handbook that Defendant's payment of the anniversary bonus was not based on Defendant's discretion.

152.     Upon information and belief, the reason Defendant structured its anniversary bonus as the payment of money, and not as the providing of an actual paid vacation, was that it wanted to encourage employees to work more days per year.

153.     The anniversary bonus payments were compensation to Defendant's employees for work performed.

154.     The anniversary bonus payments should have been taken into account by Defendant in calculating the amount of overtime compensation to which employees were entitled.

155.    Where Defendant paid an employee compensation equal to one or more weeks of pay after the employee passed an anniversary of employment, Defendant did not take the compensation paid through the anniversary bonus program into account in calculating employees' overtime rates of pay and did not make any payment to the employee of additional overtime compensation relating to the payment of anniversary bonus

156.    Upon information and belief, where Defendant paid an employee compensation equal to one or more weeks of pay after the employee passed an anniversary of employment Defendant did not pay additional overtime compensation relating to this payment in reliance on the fiction that the payment was a "vacation cashout," which was a sham designed by Defendant to avoid paying overtime compensation relating to the amounts paid to employees.

157.    Upon information and belief, Defendant knew that its rationale (that the payment was a "vacation cashout") for its practice (nonpayment of additional overtime compensation in connection with paying an employee compensation equal to one or more weeks of pay after the employee passed an anniversary of employment) was a sham because, while 29 C.F.R. § 778.219(a) permits employers to exclude from the calculation of the regular rate pay for forgoing paid leave which the employee is entitled to take, Defendant knew that it never under any circumstances permitted employees to take a paid vacation of one or more weeks, and the employees receiving the anniversary bonus pay equal to one or more weeks' pay were therefore not "employee[s] entitled to… paid leave forgo[ing] the use of leave and instead receiving a payment that is the approximate equivalent to the employees' normal earnings for a similar period of working time," but instead employees being compensated with a lump sum of money for having remained working for Defendant throughout the year preceding the anniversary.

158.   Upon information and belief, Defendant similarly failed to pay the full amount of overtime compensation owed when it paid the anniversary bonus as a payment of $200.00.

159.   When Defendant paid an employee $200.00 in anniversary bonus (as Defendant did to Plaintiff; see page 179 of Exhibit 9 (Earnings Statement with Advice Date of 5/6/21)), Defendant paid the employee less in that pay period than Defendant would have paid if Defendant had paid for the number of hours Defendant credited the employee with having worked in that period at an overtime rate of pay calculated by including the anniversary bonus as compensation earned entirely within the period it was paid.

160.   Further, upon information and belief, when Defendant paid an employee $200.00 in anniversary bonus (as Defendant did to Plaintiff; see page 179 of Exhibit 9 (Earnings Statement with Advice Date of 5/6/20), Defendant did not fully compensate the employee for the overtime compensation that would have been owed if the bonus compensation had been paid over the one-year period it was earned (and the overtime rate calculated over that period based on the actual "regular rate" of pay).

161.   By failing to pay additional overtime compensation (and/or failing to correctly calculate and pay the full amount of additional overtime compensation) owed in connection with Defendant's payment of anniversary bonus compensation, Defendant deprived Plaintiff and similarly-situated employees of overtime compensation.

**D.    Defendant Deprives Employees of Promised Holiday Pay**

162.   Defendant promised to pay employees a higher rate of pay for working on designated holidays, but often did not do so.

163.   Specifically, in Defendant's Employee Handbook (Exhibit 3), Defendant provided, at page 66, that for seven numerated holidays, "when a non-exempt (hourly paid) Employee is

required to work on a designated Company holiday, the Employee will receive time and one-half (1 ½) the Employees' based hourly rate for all hours that are actually worked on that holiday (specifically, hours worked during the 24-period on the actual designated holiday only)."

164.    However, Plaintiff worked on the listed holidays but often only received his normal based hourly rate of pay for doing so.

165.    For example, on May 31, 2021, Plaintiff worked twelve hours on Memorial Day, a day which Defendant's Employee Handbook indicates Defendant recognizes as a holiday.

166.    Plaintiff's paystub for the work he performed during the period from May 28, 2021 until June 3, 2021 is attached hereto as Exhibit 15.

167.    Exhibit 15 reflects that Plaintiff's "Holiday Work" during the period from May 28, 2021 until June 3, 2021 was paid "reg hours" and not "OT hours".

168.    Defendant only paid Plaintiff $12.50 per hour for his work on Memorial Day.

169.    Exhibit 15 shows that Defendant only paid Plaintiff $12.50 per hour for his work on Memorial Day.

**E.    Defendant Arbitrarily and Retroactively Cut Employees' Pay**

170.    Defendant would, despite agreeing to pay Plaintiff a certain rate of pay, and even reflecting that pay rate on the paystub as Plaintiff's rate of pay, sometimes arbitrarily and without advance notice to the employee pay the employee for work already performed at a lower rate of pay

171.    For instance, attached hereto Exhibit 16, is the paystub Plaintiff received from Defendant dated December 3, 2020.

172.    Exhibit 16 reflects that Plaintiff was paid for eight hours during the period beginning November 20, 2020 and ending November 26, 2020 at an hourly rate of $9.35 per hour.

173.    Prior to receiving his paystub for the period beginning November 20, 2020 and ending November 26, 2020 (which was of course after that period), Plaintiff never discussed with Defendant (and Defendant did not in any other way notify Plaintiff) that Plaintiff would be paid for any of his work performed during that period at any rate less than his base rate of pay of $12.50 per hour.

174.    Plaintiff was in fact only paid the amount shown on Exhibit 16 for the pay period reflected in Exhibit 16.

175.    In other words, Defendant did not make other payments other than as reflected in Exhibit 16 for the period of time covered by Exhibit 16.

176.    Upon information and belief, Defendant intentionally paid Plaintiff and other security guard employees in Kentucky amounts lower than their normal base rate of pay after the employee had already performed the work in question under the entirely-reasonable belief that the employee would be paid at least the normal base rate of pay for the portion of the work Defendant credited the employee with having worked, and Defendant did so in order to attempt to increase its profits by depriving employees of wages Defendant knew the employees had lawfully earned.

**F.    Defendant's Violations of the FLSA and KWHA are Willful.**

177.    Defendant's violations described above were not isolated accidents, but were instead willful and systematic violations by Defendant of its obligations under the FLSA and KWHA.

178.    Plaintiff and similarly-situated employees have complained repeatedly about Defendant's violations of the FLSA and KWHA described in Sections IV(A), IV(B), IV(D) and IV(E) above, but Defendant has continued to commit the same violations.

179.    Defendant and its affiliated companies have been repeatedly sued for their violations of the FLSA; rather than correct the violations that were the subject of these actions, Defendant continued to engage in the same violations that were the subject of these actions.

180.    Upon information and belief, the reason Defendant has continued in its violations is that it believes it can save more money by intentionally violating the KWHA and FLSA, and then paying attorneys' fees and damages in the event it is sued for its violations, than it would pay if it simply paid its employees lawfully in accordance with the KWHA and FLSA.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

181.    Plaintiff brings this action under the FLSA on behalf of himself and all similarly-situated current and former employees of Defendant who worked for Defendant in the Commonwealth of Kentucky and who were not fully paid all overtime compensation owed for such employees' overtime work which Defendant should have paid within the last three years.

182.    Plaintiff desires to pursue his FLSA claim on behalf of any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

183.    Plaintiff and the FLSA Collective are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, *inter alia*, all such individuals worked pursuant to Defendant's previously-described common pay practices and, as a result of such practices, were not paid the full and legally mandated overtime premium for hours worked over forty (40) during the workweek.  Resolution of this action requires inquiry into common facts, including, inter alia, Defendant's common compensation, time-keeping and payroll practices.

184.    Specifically, the employment policies, practices and agreements of Defendant raise questions of fact common to the proposed collective group including:

    a.  whether Defendant has engaged in a pattern or practice of permitting or
        requiring Plaintiff and members of the proposed collective to work in excess of

forty hours per workweek for the benefit of Defendant and without appropriate compensation, in violation of the FLSA;

b.  whether Defendant has engaged in a pattern or practice of failing to keep accurate records showing all hours worked by Plaintiff and members of the proposed collective, in violation of the FLSA;

c.  whether Defendant engaged in a pattern or practice of paying overtime rates of less than 1.5 times the employee's regular rate of pay;

d.  whether the conduct of Defendant was willful; and

e.  whether Plaintiff and members of the proposed collective group are entitled to lost wages, liquidated damages and the other relief requested.

185.   Plaintiff's claims are similar to those of the FLSA Collective in that Plaintiff has been subject to the same conduct as FLSA Collective Members and Plaintiff's claims are based on the same legal theory as FLSA Collective Members.

186.   The similarly situated employees are known to Defendant and are readily identifiable and may be located through Defendant's business records and the records of any payroll companies Defendant uses.

187.   Plaintiff's FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

188.   The similarly situated employees may be readily notified of the instant litigation through direct means, such as U.S. mail and/or other appropriate means, and should be allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their similar claims for overtime and other compensation violations, liquidated damages, interest, and attorneys' fees and costs under the FLSA.

189.   Plaintiff anticipates that Plaintiff will file a motion for the Court to authorize a notice approved by the Court to be sent to persons similarly-situated to Plaintiff under the FLSA (such motions are often referred to as motion "for conditional certification), and that Plaintiff will describe the persons to whom Plaintiff requests such notice be sent in such motion.

## CLASS ACTION ALLEGATIONS PURSUANT TO FED. R. CIV. P. 23 FOR DEFENDANT'S VIOLATIONS OF THE KWHA

190.    Plaintiff brings this action under the KWHA on behalf of himself and all similarly-situated current and former employees of Defendant who worked as security guard employees of Defendant in the Commonwealth of Kentucky and who were not fully paid all compensation owed for such employees' which Defendant should have paid within the last five years.

191.    Plaintiff is a member of the class he seeks to represent.

192.    Defendant failed to pay Plaintiff and the members of the class he seeks to represent wages for work performed, as described herein, in violation of the KWHA.

193.    Under the KWHA, employers are required to pay overtime compensation to non-exempt employees for overtime work performed by such employees.

194.    As Plaintiff and the similarly-situated employees were non-exempt, Defendant's refusal to pay Plaintiff and Class Members overtime compensation for overtime hours worked violated the KWHA (and in substantially the same manner as it violated the FLSA).

195.    Further, Defendant violated the KWHA with respect to Plaintiff and the similarly-situated class by failing to pay compensation relating to non-overtime work (which is not actionable under the FLSA), including failing to pay for non-overtime pre-shift work (uncompensated pre-shift work that, together with the hours Defendant credited the employee with working, were within the first forty hours of the applicable workweek week), failing to pay promised premium rates for holiday work, and paying employees rates less than their base hourly rate after the employees had already performed the work under the belief that the work would be paid at at least the base hourly rate.

196.    The Rule 23 Class is sufficiently numerous that joinder of all members is impractical, satisfying Fed. R. Civ. P. 23(a)(1).

197.    All members of the Rule 23 Class share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2). Namely, all members of the Rule 23 Class share common questions, including: (1) whether Defendant paid them overtime compensation for all overtime worked; and (2) whether Defendant failed to pay them the full amount of overtime compensation earned.

198.    Plaintiff's claims are typical of the claims of the Rule 23 Class, thus satisfying Fed. R. Civ. P. 23(a)(3) typicality.  Defendant's failure to pay Plaintiff overtime compensation was not the result of any circumstances specific to the Plaintiff.  Rather, it arose from Defendant's common pay policies of not paying overtime pay, which Defendant applied generally to their employees, despite the fact that Plaintiff and the similarly-situated employees were non-exempt and entitled to overtime pay.

199.    Plaintiff will fairly and adequately represent and protect the interests of the Rule 23 Class.

200.    Plaintiff has retained competent counsel experienced in representing classes of employees in lawsuits against their employers alleging failure to pay statutorily required overtime compensation, thus satisfying Fed. R. Civ. P. 23(a)(4).

201.    By failing to pay Plaintiff and Class Members for all hours worked, and failing to pay employees the full amount of overtime compensation earned, Defendant has created the circumstance under which questions of law and fact common to the Rule 23 Class members predominate over any questions affecting only individual members. Thus, a class action is superior to other available methods for fair and efficient adjudication of this matter. Accordingly, Plaintiff should be permitted to pursue the claims alleged herein as a class action, pursuant to Fed. R. Civ. P. 23(b)(3).

## COUNT I

### VIOLATION OF FLSA
### NONPAYMENT OF OVERTIME COMPENSATION

202.     Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

203.     Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d).

204.     During all relevant times, the members of FLSA Collective, including Plaintiff, were covered employees entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

205.     The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1½) times the regular rate at which he is employed.  See 29 U.S.C. § 207(a)(1).

206.     Plaintiff and the FLSA Collective are not exempt from the requirements of the FLSA.

207.     Plaintiff and the FLSA Collective are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek pursuant to 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

208.     Defendant knowingly failed to compensate Plaintiff and the FLSA Collective at a rate of one and one-half (1½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

209.     Indeed, Defendant made no effort to pay overtime compensation at all to Plaintiff and the FLSA Collective, paying them on the same per-ton basis for work performed beyond forty hours per week as it paid them for work performed in the first forty hours of the workweek.

210.    Defendant has willfully violated the FLSA by engaging in a pattern or practice (or patterns or practices) of:

   a.   failing to keep accurate records showing all the time it permitted and/or required Plaintiff and members of the proposed collective to work, from the first compensable act to the last compensable act;

   b.   permitting and/or requiring Plaintiff and FLSA Collective to perform integral and indispensable activities (*i.e.*, work) in excess of forty hours in a work week, for the benefit of Defendant and without compensation at the applicable federal overtime rates; and

   c.   failing to pay employees overtime compensation earned.

211.    Pursuant to 29 U.S.C. § 216(b), employers, such as Defendant, who fail to pay employee wages in conformance with the FLSA shall be liable to the employee for the unpaid minimum and overtime wages, an additional equal amount as liquidated damages, reasonable attorney's fees, and costs of the action.

## COUNT II

## VIOLATION OF KY. REV. STAT. ANN. §§ 337.275, *ET SEQ.* BY NONPAYMENT OF WAGES.

212.    All previous paragraphs are incorporated as though fully set forth herein.

213.    Plaintiff brings this claim on behalf of all members of the proposed Rule 23 Class.

214.    Kentucky state law requires that covered employees be compensated for every hour worked in a workweek. *See* KY. REV. STAT. ANN. §§ 337.275, *et seq*.

215.    KY. REV. STAT. ANN. § 337.285 requires that employees receive overtime compensation "not less than one and one-half (1-1/2) times" the employee's regular rate of pay for all hours worked over forty in one workweek. *See also* 803 Ky. Admin. Regs. 1:060.

216.    During all times material to this complaint, Defendant was a covered employer required to comply with KY. REV. STAT. ANN. § 337.010(1)(d).

217.    During all times material to this complaint Plaintiff and the Rule 23 Class were covered employees entitled to the protections of the KWHA. *See* KY. REV. STAT. ANN. § 337.010(1)(e).

218.    Plaintiff and Class Members are not exempt from receiving the KWHA's overtime benefits because they do not fall within any of the exemptions set forth therein. *See* KY. REV. STAT. ANN. § 337.285(2).

219.    Defendant has violated the KWHA with respect to Plaintiff and the Rule 23 Class by, *inter alia*, failing to compensate them for all hours worked in excess of forty per workweek at one and one-half their "regular rate" of pay.

220.    In addition, Defendant has violated the KWHA by not paying Plaintiff and the Rule 23 Class relating to non-overtime compensation, including failing to pay for non-overtime pre-shift work (uncompensated pre-shift work that, together with the hours Defendant credited the employee with working, were within the first forty hours of the applicable workweek week), failing to pay promised premium rates for holiday work, and paying employees rates less than their base hourly rate after the employees had already performed the work under the belief that the work would be paid at at least the base hourly rate.

221.    In violating the KWHA, Defendant acted willfully and with reckless disregard of clearly applicable provisions of the KWHA.

222.    Pursuant to KY. REV. STAT. ANN. § 337.385, Defendant, because it failed to pay employees the required amount of wages and overtime at the statutory rate, must reimburse the employees not only for the unpaid wages, but also for liquidated damages in an amount equal to the amount of unpaid wages.

223.    Pursuant to KY. REV. STAT. ANN. § 337.385, Plaintiff and Class Members are entitled to reimbursement of the litigation costs and attorney's fees expended if they are successful in prosecuting an action for unpaid wages.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays that the Court:

A.    Issue process and bring Defendant before the Court;

B.    Authorize notice to issue to members of the proposed collective action and permitting similarly-situated persons a reasonable opportunity to join this litigation with respect to claims under the FLSA;

C.    Certify a class of similarly-situated employees whose rights were violated by Defendant under Kentucky law, and grant relief available under Kentucky law, including unpaid wages, liquidated damages, and attorney's fees and other litigation expenses, to the class;

D.    Empanel a jury for the trial of all issues of fact;

E.    Enter a judgment awarding Plaintiff and the Classes damages in the amount of the unpaid overtime compensation, plus liquidated damages in a like amount, in amounts to be proven at trial;

F.    Award Plaintiff and similarly-situated persons joining this litigation all costs of litigation, including expert fees and attorneys' fees;

G.    Grant Plaintiff and similarly-situated persons joining this litigation all costs of litigation and such other further and/or general, legal and/or equitable relief to which they are entitled or which the Court otherwise deems appropriate.

Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com
*Counsel for Plaintiff*